| | | |
|---|---|---|
| **GILBERT J. JOSEPH and SUSAN R. JOSEPH,** | ) ) ) | |
| Appellants, | ) ) | **MEMORANDUM AND OPINION** |
| v. | ) ) | |
| **LANGDON M. COOPER,** | ) ) | |
| Trustee in Bankruptcy. | ) ) | |

**THIS MATTER** is before the Court on the Notice of Appeal of Gilbert J. Joseph ("the husband") and Susan R. Joseph ("the wife") (collectively "the Debtors"). [Doc. 1].

## I.    INTRODUCTION

More than a year after the Debtors' "no asset" discharge of their Chapter 7 bankruptcy, Langdon M. Cooper ("the Trustee") discovered assets of the Debtors that were previously undisclosed and their case was reopened. After concluding that the Debtors intentionally concealed these assets in bad faith and prejudiced their creditors and the Trustee, the Bankruptcy Court granted the Trustee's Motion to sell the Debtors' home located at 18 Tuscany Lane in Fletcher, North Carolina ("the Residence")

and the husband's retirement account valued at approximately $240,000 ("the IRA"), and denied the Debtors any exemption in either asset. The Debtors appeal that Order.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

Sometime before 2011, the Debtors began experiencing financial trouble caused at least in part by job losses, business failure, and familial obligations. [B Doc. 43 Transcript ("T.") 6-7].[2] During that time, the Debtors borrowed from the husband's IRA in 2009, 2010, and 2011, and they twice mortgaged the Residence. [T. 7-8, 28-29, 32]. The first mortgage was obtained on or about October 9, 2006, in the amount of $503,965 from AmeriTrust Mortgage Company ("AmeriTrust"), evidenced by a promissory note and Deed of Trust. [B Doc. 46 at 2] The promissory note was signed only by the husband, but the Deed of Trust pledging the Residence as security for the note, was signed by both Debtors. [Docs. 18 at 8, 20-1 at 12].

---

[1] Only the husband testified at the June 3, 2014 hearing before the Honorable George R. Hodges. No other testimony was included in the record on appeal. The facts presented below are taken from the husband's testimony, as well as the Debtors' bankruptcy petition, and the exhibits admitted by the Bankruptcy Court.

[2] Citations to the record in Bankruptcy Court, Case No. 11-10369 have the prefix letter "B" before the document number referenced on the Docket Sheet. Citations without such prefix are to the record in this Court, Civil Case No. 1:14-cv-0022.

Relevant to this analysis, the Deed of Trust contained the following language:

> Joint and Several Liability: Co-signers . . . Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant, and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument . . .

[Id. at 8]. AmeriTrust subsequently endorsed the promissory note to Wells Fargo. [B Doc. 41]. This Deed of Trust, however, was never recorded. [B Doc. 46 at 2]. Subsequently, Debtors obtained an additional loan in the amount of $40,000 from First Bank, successor to Bank of Asheville, which was secured by a Deed of Trust that was recorded. [T Exhibit 1].

The Debtors, however, were unable to recover. First Bank filed suit on February 3, 2011, requesting judgement against the Debtors, and then a month later initiated foreclosure proceedings against the Residence. [T. 9-10, 17-24]. After receiving notice of First Bank's filings, the Debtors hired attorney David Gray ("Gray") to help them file for bankruptcy. [T. 9-10, 17-24]. Gray prepared the Debtors' petition and schedules, and on April 13, 2011, Gray filed the Debtors' Chapter 7 bankruptcy petition. [B Doc. 1].

Relevant to this appeal, those filings stated that: the Residence, worth $500,000, was owned jointly by the Debtors as tenants by the entireties [Id. at 8]; all equity in the Residence was exempted, except as allowed under applicable non-bankruptcy law for property held as tenants by the entirety [Bankruptcy Doc. ("B Doc.") 8 at 1]; the Residence secured a debt owed only by the husband to Wells Fargo in the amount of $482,287 [B Doc. 1 at 13]; the Debtors intended to retain the property and maintain payments to Wells Fargo [Id. at 42]; First Bank was owed $31,977 which was classified as an unsecured business-related debt [Id. at 16]; and only the wife had an IRA. [Id. at 9]. Following the Trustee's report of no distribution, the debtors were discharged, and their case was closed on August 2, 2011.

After the case was closed, the Debtors received notice that First Bank was resuming its foreclosure on the Residence. [T. 12]. After obtaining a title search, the Debtors first learned that Wells Fargo's mortgage was unrecorded and that First Bank had a first lien against the Residence giving it the right to foreclose. [Id. at 12-13]. The husband testified that Gray told them, "if you can come up with a lump sum [to pay off First Bank] do that." [Id. at 13]. The Debtors withdrew $50,000 from the husband's IRA and wired the funds to First Bank to stop the foreclosure. [Id. at 40].

On October 20, 2011, Wells Fargo brought a civil action against the Debtors in the Buncombe County Superior Court. [Doc. 3-1]. In its Verified Amended Complaint, Wells Fargo alleged it first discovered the Deed of Trust was not recorded when it conducted a title search in or about May 2011, after the Debtors filed for bankruptcy. [Doc. 3-1 at 2]. It further alleged that only a photocopy of the Deed of Trust is available because the original was lost. [Id.]. Wells Fargo requested relief to record a photocopy of the Deed of Trust, or in the alternative to hold the Residence in a constructive trust or impose an equitable lien. [Id. at 4]. The Debtors answered, asserting that the Wells Fargo debt was discharged in bankruptcy. [B Doc. 46 at 2]. The Debtors, however, did not amend their bankruptcy petition or schedules to reflect this new position. [Id.].

Approximately one year after bringing the state court action, Wells Fargo informed the Trustee of its ongoing litigation with the Debtors, and of the possibility that the Residence passed through bankruptcy despite potentially having substantial non-exempt equity. [Id.]. On April 9, 2013, the Trustee moved to reopen the 2011 bankruptcy case in light of his recent discovery that the Residence could be an unencumbered asset. [B Doc. 14]. The Trustee's motion alleged that the Debtors had misrepresented their equity position to the Bankruptcy Court in that they had claimed that they had

little equity in the Residence due to the secured claim of Wells Fargo, but then argued post-discharge that Wells Fargo's claim did not encumber the Residence at all.  [Id. at 2-3].

The Debtors' May 1, 2013 Response to the Trustee's Motion conceded that there were errors in the petition.  [B Doc. 18].  Specifically, they asserted that Wells Fargo's claim was properly scheduled as a debt of only the husband, but it should have been listed as an unsecured debt on Schedule F, rather than a secured debt on Schedule D.  [Id. at 1].  They also conceded that First Bank was incorrectly scheduled as an unsecured debt, when it should have been listed as a secured debt.  [Id.].  They asserted that these errors were not discovered until after the case was closed, when the Debtors obtained a title search to understand why First Bank was attempting a post-discharge foreclosure.  [Id.].

The Debtors opposed the reopening of the case, arguing that Wells Fargo was not a joint creditor and that sufficient funds were deposited to pay all of the remaining joint debts without the need to reopen the case.  [Id. at 2].  On May 16, 2013, over the Debtors' objections, the Bankruptcy Judge granted the Trustee's Motion and reopened the bankruptcy case.  [B Doc. 22 at 2].  Notice was filed in the state court proceeding to stay that action until the bankruptcy case was resolved.

On January 26, 2014, the Trustee moved to sell the Residence. The motion proposed to pay Debtors the full amount of their remaining homestead exemption, $70,000, less any amount used under § 1C-1601(a)(2) from the proceeds of the sale. [B Doc. 31]. The Debtors filed their Objection to the Trustee's Motion to sell, and also filed a Motion to Amend[3] seeking to: amend schedules B and C to disclose and exempt the husband's IRA, move First Bank from schedule F (unsecured) to schedule D (secured), and move Wells Fargo from Schedule D to schedule F. [B Doc. 37]. The Trustee objected to the Debtors' Motion to Amend. [B Doc. 42]. On June 3, 2014, a hearing was held to resolve the Debtors' Motions to Amend Schedule, and the Trustee's Motion to sell the Residence. [B Doc. 46 at 1].

Following the June 3, 2014 hearing, in an Order dated August 8, 2014, the Bankruptcy Judge made findings and conclusions that can be summarized as follows:

- The Debtors held the Residence as tenants by the entireties.

- The Debtors' petition incorrectly stated Wells Fargo was a secured creditor whose interest in the Residence left very little equity available for joint creditors, when in fact, its Deed of Trust was never recorded. The note to Wells Fargo was signed only by the husband,

_____

[3] The Debtors filed two (2) Motions to Amend less than a month apart. [B Docs. 33, 37]. The Debtors withdrew the first Motion before a ruling was made. [B Doc. 40].

but both debtors signed the Deed of Trust. The Debtors stated their intention was to maintain payments to Wells Fargo. Despite arguing in state court that Wells Fargo's debt was discharged, the Debtors never amended their schedules to reflect their new position.

- The Debtors' petition incorrectly stated First Bank was an unsecured creditor, when it fact, it had a first priority mortgage against the Residence in the principal amount of $32,000, and it had initiated foreclosure proceedings against the Residence prior to the bankruptcy. The petition did not disclose First Bank's attempt to foreclose prior to the bankruptcy.

- The Debtors petition incorrectly stated that only the wife had an IRA, when in fact, the husband also had an IRA worth $234,000. The Debtors also failed to disclose three pre-petition withdrawals/taxable income from the husband's IRA totaling $81,305.56.[4]

- On three separate occasions the Debtors lied about the husband's IRA being the source of funds used to pay off the First Bank debt. First, in their Response to Interrogatories issued by Wells Fargo in the state court action, the Debtors stated "[w]hen it was discovered that First Bank . . . was the holder of a first lien, [we] cashed all of [our] retirement savings to pay off the loan in an effort to preserve [our] residence." Second, when asked at a deposition by counsel for Wells Fargo how the Debtors paid off the First Bank lien, the husband responded, "[w]e borrowed and scraped together every buck we had." Third, the Debtors' Response to the Trustee's Motion to Reopen contained the statement, "Debtors did indeed pay off the indebtedness represented by "second" mortgage to First Bank by borrowing from family to stave off the foreclosure filed on behalf of First Bank."

---

[4] When confronted about these errors and omissions at the June 3, 2014, hearing, the husband testified that he gave Gray the information to put into the petition, but he did not review the petition before it was filed. [T. 25-26]. The husband testified the petition was over 70 pages, and he did not understand most of it. [Id. at 26]. "Mr. Gray did all the paperwork," he said. [Id. at 34]. The husband testified that he did not recall Gray asking about IRA withdrawals, but that he did tell Gray about both IRAs. [Id. at 10, 31-32, 42].

- The inaccuracies in the Debtors' petition, combined with their false statements, prejudiced the Trustee directly and their creditors indirectly, because the Trustee had to incur extraordinary time and expense to "disentangle the Debtors' web of deceit." The only reason the Debtors sought to amend the petition to disclose and exempt the IRA was because the Trustee discovered the IRA despite the Debtors' efforts to conceal it.

[B Doc. 46](citations omitted).

The Bankruptcy Court granted the Trustee's Motion to sell the Residence and denied the Debtors any exemption in it

> primarily because [the Debtors] failed to disclose the true and correct nature of the Residence,[5] but also because the Debtors both executed the Wells Fargo Deed of Trust and are thus obligated to repay Wells Fargo out of the proceeds of the entireties property up to the value of the Residence.

[Id. at 5]. The Bankruptcy Judge concluded that Wells Fargo was a joint creditor on the Residence "by virtue of the fact that both Debtors signed the Wells Fargo Deed of Trust." [Id. at 4]. He further noted that, "[w]hile the [wife] has no personal liability on the note, she does have a contractual obligation to pay the debt under the Wells Fargo Deed of Trust up to the value of the pledged property." [Id.]. The Judge also held that the fact that the Deed of Trust was not recorded is of no consequence because "an

---

[5] "The Residence was scheduled by the Debtors in their bankruptcy petition, but its true nature – a virtually unencumbered residence with substantial equity available for the benefit of joint creditors – was not disclosed." [B Doc. 46 at 4].

unrecorded conveyance is valid as between the parties to the conveyance."

[Id. at 5; citing Patterson v. Bryant, 216 N.C. 550 (1939)].

The Bankruptcy Judge also denied the Debtors' Motion to Amend their schedules because he concluded that the Debtors acted in bad faith and prejudiced the Trustee.  In support of this conclusion, the Bankruptcy Judge found that

> [b]etween 13 April 2011, when the Debtors filed their bankruptcy petition in this case, and 31 January 2014 . . . Debtors hid the existence of the [IRA] from the Court, the Trustee, and their creditors by (a) failing to disclose it in their petition, at the first meeting of creditors, or even after their case was reopened; (b) failing to disclose more than $80,000 in withdrawals from the account in the two years prior to bankruptcy; and (c) lying repeatedly (including under oath) as to the source of funds used to pay off the First Bank debt.

[Id. at 6-7].  The Bankruptcy Court determined that the Debtors only disclosed the IRA on January 31, 2014, because the Trustee made a direct request for the production of documents showing the source of funds used to pay off First Bank.  [Id. at 4].

The Debtors appeal the Bankruptcy Court's Order allowing the Trustee's Motion to Sell the Residence and IRA, and denying their Motion to Amend.  Having been fully briefed by the parties, this matter is ripe for disposition.

## III.    STANDARD OF REVIEW

Section 158(a)(1) of Title 28 gives federal district courts jurisdiction to hear appeals "from final judgments, orders, and decrees" entered by bankruptcy courts.  "The Bankruptcy Court's conclusions of law are reviewed de novo and its findings of fact are reviewed for clear error."  Campbell v. Hanover Ins. Co., 457 B.R. 452, 456 (Bankr. W.D.N.C. 2011); see also In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992).  "Typically, mixed questions of law and fact are also reviewed de novo."  In re Lancett, No. 3:14-cv-175-RJC, 2015 WL 1137459, at *1 (W.D.N.C. Mar. 12, 2015) (citing Suntrust Bank v. Den-Mark Const., Inc., 406 B.R. 683, 686 (Bankr. E.D.N.C. 2009) and In re Litton, 330 F.3d 636, 642 (4th Cir. 2003)).

"If a bankruptcy court[ ] fail[s] to make sufficient factual findings in support of its legal conclusions [that] allow for meaningful appellate review under any standard, then remand will be necessary."  Rahmi v. Trumble, 464 B.R. 710, 719 (Bankr. N.D.W. Va. 2010) (citing Behrmann v. National Heritage, 663 F.3d 704, 708 (4th Cir. 2011).

## IV.    DISCUSSION

### A.    The Residence

The Debtors first challenge whether the Bankruptcy Court erred in allowing the Trustee to sell the Residence pursuant to 11 U.S.C. § 363.

The Debtors argue that Section 363 permits a Chapter 7 trustee to sell entireties property to pay joint creditors, but not to pay creditors of only one joint debtor, citing Sumy v. Schlossberg, 777 F.2d 921 (4th Cir. 1985). [Doc. 3 at 6]. It is undisputed that the Residence is entireties property. The Debtors assert that since only husband signed the Note that Wells Fargo is not a joint creditor. Hence, they argue Section 363 does not provide a legal basis for the sale. The upshot of the Debtors' argument is that Wells Fargo's failure to record the Deed of Trust left it with only one remedy – to sue the husband on the Note and obtain a judgment against him alone. Such a judgment would not reach entireties property. Davis v. Bass, 188 N.C. 200, 124 S.E. 566 (1924).

In making this argument, however, the Debtors ignore the true nature of Wells Fargo's Deed of Trust, and misconstrue the effect of the failure to record it. The Deed of Trust remained an enforceable lien against the Residence and an enforceable agreement between Wells Fargo and both Debtors (both of whom signed the Deed of Trust), notwithstanding the lack of recordation. While it was not enforceable "against lien creditors and purchasers for a valuable consideration," N.C. Gen. Stat. § 47-20, it remained enforceable as between Wells Fargo and the Debtors – both Debtors. It also remained enforceable against the Residence. First Bank

achieved priority over Wells Fargo by recording its erstwhile second deed of trust, but that did not improve the Debtor's position or increase their equity (their property still being encumbered by two deeds of trust in their stated amounts). Neither did it reduce the degree to which the Residence was encumbered. Patterson v. Bryant, 216 N.C. 550, 5 S.E.2d 849 (1939). The reason for this is simple. The purpose of the recording statute is not to protect the grantor of a deed of trust, but to protect others who may innocently deal with the grantor. The rights and obligations of the grantor vis-a-vis his grantee/mortgagee are unaffected. See Webster's Real Estate Law in North Carolina 17.02(3) (6th ed.) (citing Patterson Glass v. Lynchburg Shoe Co., 212 N.C. 70, 192 S.E. 899 (1937); Hargrove v. Adcock, 111 N.C. 166, 16 S.E. 16 (1892)).

Based on this conclusion the Bankruptcy Court determined that "Although the Wells Fargo Deed of Trust was not recorded, that failure to file does not negate the Wells Fargo Deed of Trust." [B Doc. 46 at 5]. The Bankruptcy Court, however, also concluded that the "true nature [of the Residence property was that of] a virtually unencumbered residence with substantial equity available for the benefit of joint creditors." [Id. at 4]. These conclusions would appear to be contradictory. Conclusions of law being reviewable *de novo*, the Court concludes that the effectiveness of the Wells

Fargo Deed of Trust as between the Debtors and Wells Fargo was unimpaired by the failure to record. The conclusion of the Bankruptcy Court that the Residence was "virtually unencumbered" was simply erroneous. The Deed of Trust remains enforceable. See Dewsnup v. Timm, 502 U.S. 410, 418, 112 S. Ct. 773, 778 (1992) ("a lien on real property passe[s] through bankruptcy unaffected.").[6]

The Debtors argue that the enforceability of the Deed of Trust against them is of no consequence in this proceeding. They argue that the Deed of Trust itself contains a provision that reads that the wife "is not personally obligated to pay the sums secured by this Security Instrument," [B Doc. 20-1 at 16] and therefore she is not a debtor of Wells Fargo. From this they conclude that any sale of the Residence would generate proceeds only for the payment of joint debts, and since only the husband is indebted to Wells Fargo the sale should not be allowed. [Doc. 3 at 8]. This argument, however, stands N.C. Gen. Stat. 47-20 on its head. The Debtors cannot use that provision to improve their position vis-a-vis Wells Fargo. Yet they argue that by virtue of that statute the unrecorded Deed of Trust has been essentially

_____

[6] Based on Dewsnup v. Timm, it would appear that the position taken by the Debtors in the state court action is spurious. [B Doc. 46 at 2]. This same misunderstanding of Dewsnup and N.C. Gen. Stat § 47-20 appears to have been shared by the Trustee in his Motion to reopen the case. [B Doc. 14].

stripped off of the obligation it secures, and all that is left is the debt on the Note owed by the husband alone.  Both Debtors, however, pledged the Residence as security for the Note, and their joint obligation to provide that security remains.

Debtors' argument also misapprehends the motion that was before the Bankruptcy Court.  The Trustee moved pursuant to Section 363 to sell the Residence.  Even though such sale would be free and clear of the lien of Wells Fargo's Deed of Trust, the Trustee has not moved to avoid the lien pursuant to Section 544.[7]  "It has long been recognized that the bankruptcy court has the power to authorize the sale of property free of liens with the liens attaching to the proceeds" Collier on Bankruptcy P 363.06 (Alan N. Resnick & Henry J. Sommers, eds., 16th ed.) (citing Ray v. Norseworthy, 90 U.S. (23 Wall.) 128 (1875); Van Huffel v. Harkelrode, 284 U.S. 225 (1931); Wright v. Union Central Life Ins. Co., 403 U.S. 502 (1938); Allebach v.Thomas, 16 F.2d 853 (4th Cir. 1927) cert denied, 274 U.S. 744 (1927)). Wells Fargo would at least be entitled to adequate protection under Section

---

[7] If the Trustee had moved pursuant to Section 544, the Debtors would be no better off. The Trustee would then step into the shoes of Wells Fargo as the lien creditor pursuant to Section 551, and the Residence would still be encumbered and potentially subject to sale.

363(e).[8]  In any event, Wells Fargo would have a claim against the property

of Debtors.[9]  As such, the fact that the wife was not obligated on the Note is

of no consequence.  She jointly pledged her collateral.  She cannot improve

her position and escape that obligation.[10]

This, however, does not resolve the question presented.

In order to authorize the sale, the Bankruptcy Court must determine

whether such a sale would benefit the estate.  A sale benefits the estate

when the proceeds generate equity that can be distributed among unsecured

creditors.  Reeves v. Callaway, 546 F. App'x 235, 241 (4th Cir. 2013) (noting

that although Section 363(b)(1) empowers a Trustee to sell property of the

estate, it is almost universally recognized that the Trustee should abandon

property where no unsecured creditors would benefit from its administration).

---

[8] The record does not reflect whether any such relief has been granted or sought.

[9] Even if the proceeds of the sale retain the nature of entireties property and thus are subject only to the claims of joint creditors, see In re Clifton, No. 09-02379-8-RDD, 2013 WL 3805647, at *8 (Bankr. E.D.N.C. July 19, 2013), such proceeds would still serve as collateral for the debt, just as the Residence held as tenants by the entireties served as collateral for the husband's debt on the Note.

[10] It is unclear which subsection of Section 363(f) was being applied by the Trustee or the Bankruptcy Court to authorize the sale.  For instance, if they were proceeding pursuant to subsection (f)(4), allowing a sale because the Debtors disputed the validity of Wells Fargo's lien, the Bankruptcy Court would have to preserve the proceeds as substitute collateral pending the determination of the validity of Wells Fargo's claimed lien.  Since the matter must be remanded for reasons stated infra, if the Bankruptcy Court on remand orders that a sale is authorized, a determination of which subsection of 363(f) supported such sale would appear to be necessary.

Since the Residence is held as tenants by the entireties, this rule dictates that the sale must benefit unsecured *joint* creditors. The proceeds of a sale of entireties property retain their character as only being subject to the claims of joint creditors. In re Clifton, No. 09-02379-8-RDD, 2013 WL 3805647, at *8 (Bankr. E.D.N.C. July 19, 2013); In re Surles, No. 01-13070C-7G, 2003 WL 2006846, at *2 (Bankr. M.D.N.C. May 1, 2003). Hence, the proceeds of the sale of an entireties property are subject to the claims of joint creditors but not subject to the claims of individual creditors. Id.

As applied here, the sale of the Residence is appropriate only if the sale is not made solely for Wells Fargo's benefit, but also for unsecured joint creditors who will share the proceeds after Wells Fargo's encumbrance and any exemptions of the Debtors are fully satisfied. It is noted that Wells Fargo is the only creditor specifically identified by the Bankruptcy Court as likely to benefit from the sale of the Residence.[11] But allowing the sale solely for Wells Fargo's benefit is improper because it can pursue its own legal means to recover the property in state court. See Reeves, 546 F. App'x at 235.

---

[11] However, the Bankruptcy Court's Order stated, "[w]hen the Residence is sold the net sales proceeds shall be reserved by the Trustee for payment of the allowed claims of joint creditors of the Debtors, including Wells Fargo and all administrative claims in the case." [B Doc. 46 at 5].

The recent case of In re Traverse, 753 F.3d 19, 25 (1st Cir. 2014) cert. denied sub nom. DeGiacomo v. Traverse, 135 S. Ct. 459, 190 L. Ed. 2d 332 (2014) is instructive.  In Traverse, the Debtor purchased a residence and pledged it as security for a note.  The mortgagee, however, failed to record the mortgage.  Debtor, meanwhile, had recorded her claim of the residence as an exempt homestead in accordance with state law.  When debtor filed for Chapter 7 bankruptcy the trustee sought to sell the residence for the benefit of the mortgagee.  The Bankruptcy Court allowed the sale and both the District Court and the Bankruptcy Appeals Panel affirmed.  The Court of Appeals reversed, holding that "[w]here . . . a property fails to yield any remaining equity for the estate beyond the value of its secured encumbrances and the debtor's homestead exemption, a trustee generally should not sell the home, but should leave the secured creditors to their own legal means of recovering their claims." Id. at 25.  "Precisely because of their contractual means of protecting their interests, the bankruptcy scheme typically entrusts secured creditors such as mortgagees to vindicate their claims based on their privately negotiated terms.  That in some cases a mortgagee will have no immediate means for claiming the value of its collateral – for example, when the mortgagor remains current on her mortgage payments pursuant to the contractual agreement – is not a flaw in

the system, but rather reflects Congress's intent not to augment the mortgagee's rights over a compliant mortgagor simply because the mortgagor enters the world of bankruptcy." Id. at 30.

Here, the record is insufficient to determine whether there is any equity available for creditors other than Wells Fargo, or whether there are any other joint creditors to share in such equity if it exists. It is likewise unclear whether the Debtors have claimed any equity as exempt, even though the Order of the Bankruptcy Court holds that they did not.[12] [B. Doc. 46 at 8]. Moreover, there is nothing in the record showing whether the Debtors are in default under the terms of the Note and Deed of Trust. As such, the findings of the Bankruptcy Court are insufficient to support its order allowing the sale. Therefore, the Order allowing the sale must be reversed and this matter remanded for further proceedings consistent with this decision.

---

[12] It is unclear what the Debtors claim as exempt. In their schedules they asserted that all the value of the Residence above the Wells Fargo lien was exempt. This, of course, was erroneous, because the First Bank Deed of Trust was also a lien against the Residence and was ahead of Wells Fargo's interest. Debtors then took arguably non-exempt (and undisclosed) IRA funds to "create" exempt entireties value by paying off First Bank. While the values set out in the Debtors' schedules for the Residence, the Wells Fargo balance, and the First Bank debt would indicate there is no exempt interest in the Residence, there are no findings supporting this in the Order. The Bankruptcy Court held that the Debtors had no exemption in the Residence, but it appears that this may be based upon the Court's findings of bad faith. The Bankruptcy Code, however, does not authorize a Bankruptcy Court to deny exemptions based on a debtor's bad faith. Law v. Siegel, 134 S. Ct. 1188, 1196 (2014).

## B.    The IRA

The Debtors also appeal the Bankruptcy Court's Order denying the Debtors' Motion to Amend because it found that the Debtors acted in bad faith and prejudiced the Trustee.    Even if this Court would not have necessarily reached the same findings as the Bankruptcy Court, it cannot hold those findings were clearly erroneous.    See Anderson v. City of Bessemer City, 470 U.S. 564, 573-574 (1985) (holding that a lower court's findings must be upheld if found to be plausible in light of the entire record, even though the reviewing court would have weighed the evidence differently if it sat as the trier of fact).  Debtors may amend their petition, list, schedules, or statements as a matter of course any time before the case is closed.  Fed. R. Bankr. P. 1009(a).  After the case is closed, Debtors may amend only upon showing their failure to act was the result of excusable neglect.  Fed. R. Bankr. P. 9006(b)(1).  Amendments may be denied where there are exceptional circumstances, such as bad faith or where the amendment would prejudice the opposing party.  In re Agee, 456 B.R. 740, 743 (Bankr. M.D.N.C. 2011).

The Bankruptcy Code does not define "bad faith," but like most questions of motive and intent, bad faith is a question of fact.  In re Ford, 492 F.3d 1148, 1156 (10th Cir. 2007) (citing In re Vincent J. Fasano, Inc., 55 B.R.

409 (Bankr. N.D.N.Y. 1985). It is determined from the totality of the circumstances and may be established by circumstantial evidence or inferences drawn from a course of conduct. Farmers Coop. Ass'n of Talmage v. Strunk, 671 F.2d 391, 395 (10th Cir.1982). "One circumstance that is strongly indicative of bad faith is an attempt on the part of a debtor to conceal an asset." In re Agee, 456 B.R. 740 at 743 (Bankr. M.D.N.C. 2011) (citing Tignor v. Parkinson, 729 F.2d 977, 978 (4th Cir. 1984)).

The Bankruptcy Court determined that the Debtors intentionally, and in bad faith, filed their petition and schedules with several errors and omissions. It found the Debtors misrepresented the equity in the Residence, concealed the IRA, and also failed to disclose $80,000 in pre-petition withdrawals/taxable income from the account to prevent it from being discovered. The evidence regarding the Debtors' failure to disclose the IRA and their withdrawals from it supports the Bankruptcy Court's finding of bad faith. Although the husband testified that he did not understand the petition and did not review the petition before it was filed, both Debtors swore under penalty of perjury that the petition was true and correct. Moreover, the Debtors not only failed to disclose the IRA, but also made three separate

statements to further their concealment of it.[13]  The husband testified that these were innocent misstatements, but the Bankruptcy Court, which had the opportunity to consider and assess the husband's credibility, found these statements to be lies made intentionally to conceal the Debtors' largest asset.  That finding is entitled to deference by this Court.  See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 565 (U.S. 1985).

Finally, the Bankruptcy Court also found that the Trustee was prejudiced by the Debtors' actions because he had to spend time and incur costs to overcome the Debtors' evasive responses and misrepresentations. On the Trustee's Motion, this 2011 bankruptcy case was reopened in May of 2013, and since that time the Trustee has been investigating the Debtors and their assets.  Had the Debtors been forthcoming, these expenses would not have been incurred.  Accordingly, because the Bankruptcy Court's determination of bad faith and prejudice is plausible in light of the evidence, its Order denying the Debtors' Motion to Amend is affirmed.

---

[13] First, in their Response to Interrogatories issued by Wells Fargo in the state court action, the Debtors stated "[w]hen it was discovered that First Bank . . . was the holder of a first lien, [we] cashed all of [our] retirement savings to pay off the loan in an effort to preserve [our] residence."  Second, when asked at a deposition by counsel for Wells Fargo how the Debtors paid off the First Bank lien, the husband responded, "[w]e borrowed and scraped together every buck we had."  Third, the Debtors' Response to the Trustee's Motion to Reopen contained the statement, "Debtors did indeed pay off the indebtedness represented by "second" mortgage to First Bank by borrowing from family to stave off the foreclosure filed on behalf of First Bank."  [B Doc. 46].

# ORDER

**IT IS, THEREFORE, ORDERED** that Bankruptcy Court's August 8, 2014 Order Granting Trustee's Motion To Sell And Denying Debtors' Motion To Amend Schedules is hereby **REVERSED AND REMANDED IN PART and AFFIRMED IN PART** as follows:

1.  The portion of the Bankruptcy Court's August 8, 2014, Order granting the Trustee's Motion to Sell the Residence and denying the Debtors any exemption in that asset is hereby **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

2.  The portion of the Bankruptcy Court's August 8, 2014, Order denying the Debtors' Motion to Amend is **AFFIRMED**.

    **IT IS SO ORDERED**.

Signed: September 29, 2015

Martin Reidinger
United States District Judge

23